UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:11-cv-2076 |
| v. ) | |
| ) | |
| AMERICAN COMMERCIAL LINES, LLC ) | Section: |
| and D.R.D. TOWING COMPANY, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |

UNITED STATES' COMPLAINT ASSERTING CLAIMS UNDER
THE CLEAN WATER ACT, THE OIL POLLUTION ACT OF 1990, AND THE
DECLARATORY JUDGMENT ACT AGAINST
AMERICAN COMMERCIAL LINES, LLC AND D.R.D. TOWING COMPANY, LLC

NATURE OF THE ACTION

1.      This case stems from the collision of an ocean-going tanker and a barge under tow on the Mississippi River near New Orleans, Louisiana.  On July 23, 2008, the M/V TINTOMARA, a tanker ship designed to carry chemical or oil products, was sailing downbound on the Lower Mississippi River.  Heading in the opposite direction, the tug M/V MEL OLIVER was pushing an oil-laden tanker barge, DM-932, upriver.  As the vessels closed, the MEL OLIVER—without warning—began an arcing turn to port and crossed in front of the TINTOMARA.  Unable to stop, the larger vessel struck DM-932, causing oil to spill into the river ("Spill").

2.      This case of admiralty and maritime jurisdiction is brought under the Federal Water Pollution Control Act, generally referred to as the "Clean Water Act"

("CWA"), 33 U.S.C. §§ 1251-1376 (2006); the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701-61 (2006); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 (2006).

## JURISDICTION AND VENUE

3.   The United States is authorized to bring suit, and the Court has jurisdiction, pursuant to 28 U.S.C. § 1331 (2006) (Federal question), § 1333 (2006) (Admiralty), § 1345 (2006) (United States as plaintiff), § 1355 (2006) (fine, penalty, or forfeiture); 33 U.S.C. §§ 1321(b)(7)(E) (2006) and § 1321(n) (2006) (CWA); and 33 U.S.C. § 2717(b) (2006) (OPA).

4.   Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 98(a) (2006) (Louisiana), § 1391(b) (2006) (venue generally), and § 1395(a) (2006) (fine, penalty, or forfeiture); 33 U.S.C. § 1321(b)(7)(E) (2006) (CWA); and 33 U.S.C. § 2717(b) (2006) (OPA).

## DEFENDANTS

5.   At all times material herein, the tug MEL OLIVER, the tank barge DM-932, and its fuel oil cargo were owned by American Commercial Lines, LLC ("ACL"). Defendant ACL is believed to be a foreign limited liability corporation existing under the laws of the State of Delaware and within the jurisdiction of this Court with respect to the matters sued upon herein.  Furthermore, actions of ACL have had direct impacts within the State of Louisiana, especially within this District, including but not limited to effects from the oil spill following the collision.

6. At all times material herein, the MEL OLIVER was operated by Defendant D.R.D. Towing Company, LLC ("DRD"). DRD is a family-owned towing company located in Harahan, Louisiana. Actions of DRD have had direct impacts within the State of Louisiana, especially within this District, including but not limited to effects from the oil spill following the collision.

7. At all material times herein, ACL was in contractual privity with DRD.

## GENERAL ALLEGATIONS

8. DM-932 (No. 546058) was a bulk-liquid cargo barge ported in or near New Orleans. Flagged in the United States, it measured 195 feet in length and could carry up to 10,550 barrels of product.

9. The towing vessel MEL OLIVER (No. 614387) is also U.S.-flagged. It displaces 162 gross tons, measures 61.2 feet long, and is likewise ported in or near New Orleans.

10. ACL entered into a contract whereby it rented the MEL OLIVER to DRD without a crew. Specifically, ACL demise or "bare-boat" chartered the MEL OLIVER to DRD for the sum of $1.00 a day. DRD would then time-charter the MEL OLIVER back to ACL, *with a crew*, for the sum of $2,740 a day. (The original agreements named the M/V PAM D as the subject of the charter. The charter party was later amended to substitute the MEL OLIVER.)

11. The day before the accident, the MEL OLIVER was operating out of the ACL facility in Harahan, Lousiana. Although it was supposed to be crewed by four

people—a captain, an apprentice mate (steersman), and two deck hands—only three persons were in fact onboard. Captain Terry Carver had left the tug without authorization nearly three days before. No one replaced him. Gary Daigle, another DRD captain, not only knew that Carver had left, but had loaned Carver his car knowing that Carver intended, for personal reasons, to drive to Illinois.

12. John Bavaret's license authorized him only to serve as an Apprentice Mate (Steersman) under the supervision of the licensed master, Carver. Carver's departure left Steersman Bavaret unsupervised and in charge of the MEL OLIVER, a circumstance that would continue until the accident, by which time Bavaret had operated the MEL OLIVER, off and on, alone for more than 55 hours.

13. Prior to the accident, DRD had authorized Steersman Bavaret to be placed in the rotation as a "Captain," holding his own watch, and paid him a Captain's rate of pay when he did so, despite its knowledge that Bavaret held only a Steersman's License.

14. On the afternoon of July 28, 2008, an ACL dispatcher sent the MEL OLIVER from Harahan to tow DM-932 downriver to J.W. Stone Oil Distributor, LLC, in Gretna, Louisiana, for loading.

15. The MEL OLIVER arrived at the J.W. Stone facility with the barge at approximately 2:00 p.m. At 12:35 a.m., the laden MEL OLIVER departed the J.W. Stone facility.

16. The MEL OLIVER hung close to the East Bank as it drove up the Lower Mississipi River. The voyage proceeded this way for approximately 50 minutes, until the

MEL OLIVER began an unannounced 90-degree turn to port near mile marker 99 and the Harvey Lock.

17. The crew of the downbound vessel TINTOMARA and the New Orleans Vessel Traffic Service staff noticed the MEL OLIVER as it began to swing off-course. They repeatedly called out to the MEL OLIVER by radio, however, no one answered. In a further attempt to get the master's attention, the crew of the TINTOMARA and another nearby vessel shined spotlights on the wheelhouse of the MEL OLIVER. Still, there was no response. The TINTOMARA twice blew its whistle, but the MEL OLIVER did not react.

18. At 1:30 a.m., on July 23, 2008, the MEL OLIVER drove across the TINTOMARA's path. Carried by the current and its own momentum, the larger ship, unable to stop, squarely struck DM-932 amidship. As it did so, the face wires connecting the MEL OLIVER to DM-932 snapped. Wrapped around the TINTOMARA's bow, DM-932 was carried downriver until it eventually became dislodged and sank just upriver of the Crescent City Connector Bridge.

19. Oil was discharged into and on waters of the Lower Mississippi River, near New Orleans, and its shorelines as a result of the collision. DM-932 was carrying 9,983 barrels (419,286 gallons) of No. 6 Fuel Oil. After the accident, 3,249 barrels (136,458 gallons) of oil were recovered from the only tank (of three) that had not been not ruptured by the collision. An estimated 6,734 barrels (282,828 gallons) of oil were released into the water.

20. In accordance with OPA, a pollution recovery effort was launched under the control of a "Unified Command" organized by the U.S. Coast Guard. Federal representatives from the Coast Guard, the Environmental Protection Agency, the National Oceanographic and Atmospheric Administration, and the Fish and Wildlife Service participated. State officials from the Louisiana Department of Environmental Quality and the Louisiana Oil Spill Coordination Office were also involved, as was ACL.

21. The Unified Command called on Oil Spill Response Organizations (OSROs) to deploy spill protection and recovery equipment. OSRO Contractors included: Oil Mop, LLC; Environmental Safety & Health Services, Inc.; United States Environmental Services, LLC; Marine Spill Response Corporation; and Clean Harbors.

22. Coast Guard restrictions imposed as a consequence of the accident brought vessel traffic to a halt. Twenty-nine miles of the Lower Mississippi River, from mile-marker 98 to the Southwest Pass Sea-Buoy, were closed. On July 30, 2008, the river was re-opened for navigation.

23. The CWA imposes civil penalties on those who unlawfully discharge oil into and upon the navigable waters of the United States and adjoining shorelines. Polluters are strictly liable under this Act. Penalties are based in part on the number of barrels of oil discharged. *See* 33 U.S.C. § 1321 (2006) ("Oil & hazardous substances liability") and 33 C.F.R. § 27.3 (2010) ("Penalty Adjustment Table").

24. Within the meaning of the CWA, oil discharges in "such quantities as may be harmful" include oil spills that cause "a film or sheen upon or discoloration of the

surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3(b) (2010).  The Spill was a discharge of oil "in such quantities as may be harmful," within the meaning of the CWA.  33 U.S.C. § 1321(b)(3) (2006).

25.    Title I of OPA, 33 U.S.C. §§ 2701-20 (2006), assigns strict liability to the owners and operators of vessels that discharge oil into the navigable waters of the United States.  Section 2702(a) provides that "each responsible party for a vessel or facility from which oil is discharged . . . is liable for the removal costs and damages . . . that result from such incident."  "[A]ny person owning, operating, or demise chartering the vessel" is deemed a "responsible party."  33 U.S.C. § 2701(32)(A) (2006).

26.    The United States expended "removal costs" and sustained "damages" within the meaning of OPA.  33 U.S.C. § 2702(b) (2006).  To recover such costs and damages, the United States hereby asserts a claim on behalf of the Oil Spill Liability Trust Fund ("Fund"), from which the United States paid those costs.

27.    Furthermore, OPA, at sections 2702, 2712, and 2715 (2006), subrogates the United States to the rights of the designated Responsible Party, claimant, or other governmental that is paid compensation from the Fund for removal costs or damages as defined by OPA.  Thus, if new claims are filed, the United States specifically reserves the right to amend this claim to assert any or all such subrogated rights and claims in a total amount to be established at trial, which will include amounts for prejudgment interest, administrative and adjudicative costs, and attorney's fees.

28. As a result of the Spill, "natural resources," as defined in OPA, 33 U.S.C. § 2701(20) (2006), under the trusteeship of the United States and the State of Louisiana, have been threatened, injured, destroyed, or lost. The discharged oil harmed natural resources, including aquatic organisms, birds, wildlife, vegetation, and habitats. Response activities may also have led to injury to, loss of, loss of use of or destruction of natural resources in and around the Lower Mississippi River, and its shorelines.

29. When there is more than one responsible party, as here with DRD and ACL, liability for the aforementioned costs or damages is joint and several.

30. The Spill was caused by the gross negligence and the violation of applicable federal safety, or operating regulations by DRD, which was at all relevant times acting pursuant to its contractual relationship with ACL. Specifically:

    a. Steersman Bavaret caused this marine casualty when he turned directly in front of the TINTOMARA.

    b. At the time, Bavaret had operated the MEL OLIVER without relief for nearly three days. It was improper for him to do so, for a towing vessel, if operated more than 12 hours in a 24-hour period, must be crewed by a second person who is also licensed to serve as master or mate. Although watches may be divided, no operator is allowed to work more than 12 hours in any 24-hour period. *See* 46 U.S.C. §§ 8104(h) (2006) (except in an emergency, a master or mate of a towing vessel at least 26 feet in length may not work not more than 12 hours in a consecutive 24 hour period); 8904(c) (2006) ("Secretary may prescribe by regulation requirements for maximum hours of

service . . . of individuals engaged on a towing vessel that is at least 26 feet in length); and 46 C.F.R. 15.705(d) (2010) (repeating the "12 in 24" rule).

        c.      Though he held only a Steersman's license, Bavaret acted as the MEL OLIVER's captain, operating the tug without supervision in violation of both statute and regulation.  46 U.S.C. § 8904(a) (2006) ("towing vessel that is at least 26 feet in length . . . shall be operated by an individual licensed by the Secretary to operate that type of vessel in the particular geographic area, under prescribed regulations"); 46 C.F.R. § 15.401 (2010) (a mariner may not be employed in a capacity that exceeds the limits of his credential).

        d.      DRD's assignment of Steersman Bavaret to serve as a tug captain, a position he was not licensed to perform, violated 46 C.F.R. § 15.401 (2010).  In fact, Bavaret was authorized only to "perform watchkeeping on the bridge, while in training onboard a towing vessel under the direct supervision and in the presence of a master or mate (pilot) of towing vessels."  46 C.F.R. § 10.107(b) (2010).

        e.      The MEL OLIVER was required to have a radio that could be operated from the bridge.  33 U.S.C. § 1203 (requiring every towing vessel over 26 feet long to have such a radio).  Bavaret was required to monitor that radio on a common frequency as he navigated.  33 U.S.C. § 1204 (master or his designee shall maintain a listening watch on the designated frequency).  He also had an affirmative duty to broadcast his intentions as necessary for the safe navigation of other vessels in the area.  33 C.F.R. § 26.04 (2010) ("Each person who is required to maintain a listening watch

under section 5 of the Act [codified at 33 U.S.C. § 1204] shall, when necessary, transmit and confirm, on the designated frequency, the intentions of his vessel and any other information."). Notwithstanding these requirements, Bavaret ignored the multiple radio transmissions from both the TINTOMARA and the New Orleans Vessel Traffic Service. Moreover, he did not announce that he intended to turn in front of the TINTOMARA.

    f.  The owner, master, or operator of a towing vessel, such as the MEL OLIVER, must ensure that each person directing and controlling the movement of the vessel "[e]valuates the danger of each closing visual or radar contact" and "[p]roceeds at a safe speed taking into account the weather, visibility, density of traffic, draft of tow, possibility of wake damage, speed and direction of the current, and local speed-limits." 33 C.F.R.§§ 164.78(4) & 164.78(7) (2010). Bavaret failed to evaluate the danger created when he began to turn to port. Had he done so, he would have corrected by steering the MEL OLIVER and DM-932 back toward the East Bank.

    g.  Inland Navigation Rules "apply to all vessels upon the inland waters of the United States . . . ," including the Lower Missippi River. 33 C.F.R. § 83.01 (2010). On July 23, 2008, the MEL OLIVER violated one or more of the following Inland Navigation Rules: 33 C.F.R. § 83.05 (2010) (requiring a proper look-out); 33 C.F.R. § 83.06 (2010) (requiring that a safe speed be maintained); 33 C.F.R. § 83.07 (2010) (requiring the use of all means possible to determine if a risk of collision exists); 33 C.F.R. § 83.08 (2010) (vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion if necessary to avoid collision); 33 C.F.R. § 83.14

(2010) (requiring power-driven vessels meeting on reciprocal courses to alter course to starboard so that each shall pass on the port side of the other); and 33 C.F.R. § 83.15 (2010) ("When two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel.").

<u>FIRST CLAIM FOR RELIEF</u>

(Civil Penalties Under Section 311(b) of the Clean Water Act)

31.     Plaintiff, the United States of America, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

32.     Pursuant to 33 U.S.C. § 1321(b)(7) (2006), Defendants ACL and DRD are each liable to the United States for a judicially assessed CWA civil penalty in an amount to be determined at trial.

<u>SECOND CLAIM FOR RELIEF</u>

(Declaratory Judgment that ACL and DRD Are Responsible Parties under OPA)

33.     Plaintiff, the United States of America, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

34.     The United States has sustained "damages," as defined in 33 U.S.C. § 2702(b)(2) (2006), for, *inter alia*, injuries to, destruction of, loss of, or loss of use of natural resources and net loss of taxes, royalties, rents, fees, and net profit shares due to

the injury to, destruction of, and loss of real property, personal property, and natural resources.

35. OPA provides that "each responsible party for a vessel or facility from which oil is discharged . . . is liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a) (2006). The "responsible party" for a vessel is "any person owning, operating, or demise chartering the vessel." 33 U.S.C. § 2701(32)(A) (2006) .

36. Both ACL, as the owner of DM-932, and DRD, as its operator, are responsible parties under OPA's provisions. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 (2006), and OPA, 33 U.S.C. § 2717(f)(2) (2006), the United States is entitled to, and hereby seeks, a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants ACL and DRD, to the effect that Defendants are responsible and strictly liable for removal costs and damages under OPA.

## THIRD CLAIM FOR RELIEF

37. Plaintiff, the United States of America, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

38. OPA places certain liability limits on particular classes of responsible parties. Pertinent here, the liability limit for DM-932 is $4 million and the limit for the MEL OLIVER is $800,000. *See* 33 U.S.C. § 2704(a) (2006) (limits on liability). Such limits do not apply, however, when the discharge of oil results from gross negligence by a

responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party. *See* 33 U.S.C. § 2704(c) (2006) (exceptions). Nor do the limits apply if one of the aforementioned parties has violated an applicable Federal safety or operating regulation. *Id.*

39. Based on the many statutory and regulatory violations committed by the ACL, DRD, or the MEL OLIVER, the United States asks that the Court enter a declaratory judgment that all Defendants are jointly and severally liable without limitation under OPA, 33 U.S.C. § 2702(a) (2006), for *all* removal costs and damages resulting from the Spill, which will be binding on this action and on any subsequent action or actions to recover removal costs or damages.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

1. Assess a civil penalty, under section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7) (2006), against each Defendant in an amount to be determined by the Court;

2. Enter a declaratory judgment that all Defendants are jointly and severally liable without limitation under section 1002(a) of OPA, 33 U.S.C. § 2702(a) (2006), for *all* removal costs and damages resulting from the Spill, which will be binding on this action and on any subsequent action or actions to recover removal costs or damages;

3. Award the United States the sum of the removal cost and damage claims satisfied by the Fund by the time of trial, which, to date, stands at $24,782,943.44; and

4. Grant such other relief as the Court deems just and proper.

DATED: August 22, 2011

                                        Respectfully submitted,

                                        TONY WEST
                                        Assistant Attorney General

                                        */s/ Michael A. DiLauro*
                                        MICHAEL A. DiLAURO, T.A.
                                        SARAH S. KEAST
                                        Aviation & Admiralty Litigation
                                        Torts Branch, Civil Division
                                        U.S. Department of Justice
                                        (overnight courier)
                                        1425 New York Ave., N.W., Ste. 10146
                                        Washington, D.C. 20005
                                        (mailing)
                                        P.O. Box 14271
                                        Washington, D.C. 20044-4271
                                        Telephone: (202) 616-4047
                                        Facsimile:   (202) 616-4159
                                        michael.dilauro@usdoj.gov